PINE STREET CONGREGATIONAL SOCIETY *vs.* WILLIAM F. WELD & others.

In 1828 land purchased and a meeting-house built thereon by subscription were, after a congregational church had been organized to worship there, conveyed by indenture, in which the male members of the church joined, to fourteen of the subscribers, in trust to maintain forever there the public worship of God according to the doctrine of the Westminster Assembly's Shorter Catechism and the Boston Confession of Faith of 1680, under such Protestant Congregational or Presbyterian ministers of the Gospel as the male members of the church should from time to time elect, without interference by the proprietors of pews therein not being members of the church; with directions for selling pews and filling vacancies in the number of trustees; and a proviso that upon the reduction of that number to three, or the dissolution of the church, the premises should remain and be to the sole use of the then proprietors of pews in fee. The society obtained an act of incorporation, and in 1831 the premises were conveyed, at the unanimous request of the male members of the church, by an indenture in which all the parties to the first indenture joined, and free and discharged of the provisions of that indenture, to the society in fee. The society retained open and undisputed possession thereof, with the acquiescence of all parties to the first indenture, and claiming to hold free and discharged of all trusts, for twenty seven years; and were then authorized by the legislature to sell the premises free and discharged of all trusts, and to use the proceeds to purchase another lot of land and build thereon another meeting-house. *Held*, that the society could sell and convey a clear and absolute title in fee.

BILL IN EQUITY to enforce the specific performance of a written contract made on the 1st of July 1858 by Weld with the plaintiffs for the purchase of their meeting-house and land at the corner of Washington and Pine Streets in Boston. The case was submitted to the decision of the court, upon the bill, answers and master's reports, from which it appeared to be as follows: '

On the 6th of May 1828, Samuel Hubbard, John Tappan and William Ropes conveyed the premises in fee to John C. Proctor and thirteen others as joint tenants, by an indenture of three parts, which recited that the grantees "and others their associates did agree together to found two new churches of the Orthodox faith in the said city of Boston, and to erect two houses for the public worship of Almighty God, for the accommodation of said churches, one to be located in the northerly part and the other in the southerly part of the city, and for the accomplishment of this charity they did subscribe and pay divers sums of money," and appointed a building committee for each

house; that the building committee for the house in the southerly part of the city, " pursuant to the design of the said founders, and the authority by them given to said committee," purchased the land now in question, and took a deed thereof to said Hubbard, Tappan and Ropes, and erected thereon a house for public worship; that " a church of Christ has been gathered upon this foundation, called the Pine Street Church, to occupy said house, a part of the male members of which church are the parties of the third part hereof; and whereas it is intended by the members of the said church, agreeably to the design of the founders thereof, to maintain in the said house the public worship of God, under such Protestant Congregational or Presbyterian minister of the Gospel of Christ, as the male members of said church shall from time to time elect, independently and exclusively of such persons as may at any time form part of the congregation usually worshipping in said house, although such persons may be proprietors of pews therein; to the end that, by the blessing of Almighty God, a succession of holy persons may be elected pastors of said church, and the faithful preaching of Christ crucified, agreeably to the general system of doctrines expressed in the Westminster Assembly's Shorter Catechism, and in the Confession of Faith owned and consented to by the elders and messengers of the churches assembled at Boston, May 12th, A. D. 1680, be continued in the said house to the latest generations; and whereas, after deliberation, it has been thought advisable that the fee in said house and land should be vested in and held by a number of persons, selected from among the founders thereof, who are also members of sister Orthodox churches, in trust for the said church of Christ gathered as aforesaid, and for the more perfect protection thereof, according to human judgment; and also to preserve the rights of those persons who are, or may become, proprietors of pews in said house, but who may not be members of the said church; so that the rights of the church, and congregation who are not of the church, may be equally guarded; and whereas, in pursuance of this object, the said founders and the said parties of the third part hereof have mutually selected and agreed upon the

parties of the second part, from among the founders aforesaid, as fit and suitable persons to become such trustees ; and the said parties of the second part, upon the united solicitation of the said founders and the parties of the third part hereof, have agreed to receive and execute said trust, and receive and hold the fee of said house and land, for such use and purposes."

The indenture declared " that this sale and conveyance is made upon the trusts and for the purposes hereinafter expressed, and for no other use, intent or purpose whatsoever: that is to say, upon this special trust and confidence, that the said parties of the second part, the survivors of them, their assigns and the survivor of them, shall and do permit and suffer so much of the said house and land as is designed for public worship, at all times hereafter, to be used, occupied and enjoyed, as and for a meeting-house or place for the public Protestant religious worship and service of the one living and true God, Father, Son and Holy Spirit, by the said Pine Street Church, and such society or congregation as shall regularly attend public worship under the ministration of the present pastor, the Rev. Thomas H. Skinner, D. D., or such pastor or pastors as shall from time to time be elected by the male members of said church : and shall suffer and permit such Protestant Congregational or Presbyterian ministers of the Gospel as the male members of said church shall from time to time elect and engage, and no others, statedly to preach and to perform religious exercises and services therein ; and shall and will suffer and permit the deacons or a committee of the said church to lease the remaining part of said house and land, and to sell, demise and dispose of, or covenant and agree for, the having, holding and enjoying the pews or seats in said meeting-house ; " and that " for the purpose of reimbursing the original proprietors," the parties of the third part should cause the pews in the house to be appraised and sold according to the directions of the indenture, and the proceeds appropriated to the payment of the expenses incurred by the building committee, and of the amounts paid by the subscribers ; " provided however that no such sale be contrary to nor inconsistent with any of the trusts herein expressed and declared, and subject

also to all the rights of property of said trustees as proprietors
of the fee of said land and tenement;" and upon the further
trust that the parties of the second part and the survivors, their
assigns and the survivors of them, should permit the deacons of
the church or any committee chosen by the male members
thereof to collect all taxes, rents and profits of the house and
land, and to appropriate and pay over the same according to the
direction of a majority of the male members of the church at a
regular meeting, and to account with and be accountable there-
for to the church only, and to make such repairs as the male
members of the church should judge necessary or expedient;
"it being well understood that no proprietors of pews, who are
not members of the said church, shall ever have a voice, or be
allowed to take any part or to act in the said business, or in the
choice of a pastor, either directly or indirectly, and that their
title and right, interest and property, in these pews, shall ever be
subject to these incumbrances, restrictions and reservations;"
and upon the further trust that as often as the trustees should
by death be reduced to the number of seven, the survivors should
elect and appoint seven new trustees to be cotrustees and joint ten-
ants with them ; provided however, and it was expressly declared
and agreed, that upon any default so to elect and appoint new
trustees within two years after the number of trustees should be
reduced to three, " or upon the dissolution of said church, which-
soever shall first happen, the premises shall thereafter remain
and be held to the sole use of the several persons who shall
then be proprietors of pews in said house, and to their respective
heirs, executors, administrators and assigns forever.   And the
parties of the second part hereof do solemnly hereby covenant,
and as in the presence of God severally grant and agree to and
with the parties of the third part hereof, and the successive male
members of the Pine Street Church," and with each other, " that
during the whole continuance of the trusts aforesaid, they will
together hold the said land and house in joint tenancy," and not
sue for, attempt or permit any partition and division of the
premises, and that this covenant and agreement might be
pleaded by any one or more of the trustees, or of the members

of the church, òr by any other person or persons interested therein, in bar of any attempted partition, and also that they would faithfully perform and not refuse or neglect to execute the trusts confided to them respectively, and never do or cause or suffer to be done any act or thing to prevent, interrupt, molest, disturb or hinder the use, occupation and enjoyment of the house and land in the manner and for the uses and purposes in this indenture expressed and declared. "And it is clearly understood and agreed, that such persons so offending in any of these respects shall be liable and subject to the' action of the said parties of the third part hereof and their successors, or of the said church itself, or of the deacons thereof, to compel such persons, in case of refusal or neglect as aforesaid, to execute the said trusts, or any or either of them; or in case of interruption, molestation, disturbance or hindrance, to recover such damages as may have been sustained by reason thereof. And to prevent all doubts with regard to the meaning of the word ' Church,' as used in this indenture, it is hereby mutually understood and agreed by the parties to these presents, that by the word ' Church' it is intended to express a company of believers united into one body by an holy covenant, for the public worship of Almighty God, and the mutual edification of one another in the fellowship of the Lord Jesus. And by ' the Pine Street Church' is intended, as well the several persons composing the third party of these presents, as the persons, whether females or males, who have entered or may hereafter enter into a written covenant and agreement, publicly consented unto by them, whereby they give up themselves unto the Lord Jesus Christ, to the observing of his ordinances together in the same society; which covenant, as entered upon the records of the Pine Street Church, may be referred to at pleasure by either of the parties to these presents. And lastly, it is mutually understood and agreed, and again declared by all the parties hereunto, that the said house and land are to and shall be holden by the said parties of the second part hereof, and their associates and successors to be chosen as aforesaid, upon the trusts and for the uses and purposes expressed and declared in this indenture, and for no other use, intent or purpose whatsoever."

From the date of this indenture until the 17th of December 1831 the land and meeting-house were occupied by the Pine Street Church according to its terms; the secular and pecuniary affairs of the church were managed by the deacons under the direction of the male members of the church; and the deacons, acting under the indenture, gave deeds of the pews. The church began in 1828 with a debt of $20,000, which was increased during these three years; and could not long go on, and support preaching and other institutions of worship, without pecuniary aid, which it was unable to procure, either by sale of pews or by subscriptions, in consequence of the provisions of the indenture, by which pewholders had no voice in the affairs of the church.

The plaintiffs were incorporated by *St.* 1831, *c.* 37, and on the 10th of August 1831 the male members of the church passed a unanimous vote, the material parts of which were as follows: " Whereas, after solemn deliberation on the part of the male members of said church, it has been thought to be expedient that the restrictions to which the proprietors of pews in said meeting-house are subject by the said deed of trust should be removed in part, and that the fee in said house and land should be conveyed to the Pine Street Congregational Society, which has recently been incorporated by an act of the general court, so that the said society may give deeds of pews, by virtue of which the proprietors of pews in said house shall have a concurrent voice with the male members of the church in the choice of a minister, and shall also have the sole management of the secular and pecuniary affairs of the society; and whereas the proprietors of pews under said trust deed have generally surrendered the deeds held by them to be cancelled: Therefore voted, that the parties of the second part to the aforesaid indenture be and they are hereby authorized and requested to execute such deed or deeds of the property held by them as aforesaid, as may be suitable and proper to vest the fee in said meeting-house and the land thereto belonging in the said Pine Street Congregational Society, free and clear of all the trusts subject to which the said premises are now held by the said trustees, and that the said Hubbard, Tappan and Ropes be also requested to unite in

such deed 'or deeds, on behalf of the founders of said **Pine Street Church,** to express their assent to the conveyance so to be made to the said Pine Street Congregational Society."

On the 17th of December 1831, a second indenture was executed by Hubbard, Tappan and Ropes, Proctor and the other trustees under the first indenture, and the plaintiffs, which repeated the recitals of that indenture, and also recited the vote of August 10th, and by which said trustees conveyed the premises to the plaintiffs in fee ; and Hubbard, Tappan and Ropes, " for themselves and their respective heirs, and so far as they have power and authority for this purpose, in behalf also of the founders of said Pine Street Church, do hereby declare their full and free assent to this conveyance ; and do in like manner for themselves and their respective heirs, and in behalf of the said founders, release and discharge all the covenants and agreements contained in said indenture of May 6th, A. D. 1828, on the part of the parties of the second and third parts thereto, which may in any manner interfere or be inconsistent with this present conveyance ; meaning hereby, so far as they have power and authority to do it, to approve and confirm the conveyance made by these presents, so that the said Pine Street Congregational Society may be seised and possessed of an absolute estate in fee simple in the premises, freely and clearly acquitted and discharged of and from all and all manner of claims and demands of them the said parties of the first part hereto, or of the said founders of said Pine Street Church," except on account of' a debt of $10,000 secured by mortgage on the estate, which the plaintiffs paid in 1843.

All persons who had received deeds of pews from the deacons of the church (except one for whom a deed was prepared, and who afterwards died, and neither he nor his heirs ever applied for the deed, although duly notified of its existence) delivered them up and took new deeds from the plaintiffs. Since the 17th of December 1831, the plaintiffs have been in possession of and have managed and controlled the estate, with the full knowledge and consent of the male members of the church, and without any one ever claiming, acting upon or attempting to enforce the

trusts of the first indenture ; and there has never been any dispute or difficulty between the church and the plaintiffs concerning the property. In consequence of the conveyance of 1831, the church was enabled to procure the necessary money for the support of divine worship, and to reduce its debt. The plaintiffs have also expended the sum of $21,000 in repairing and altering their meeting-house, with the full knowledge and consent of the members of the church, and with the understanding that the trusts in the indenture of 1828 were fully discharged.

In 1858, the plaintiffs obtained and duly accepted an act of the legislature, purporting to authorize them to sell their land and meeting-house free and discharged of all trusts, and to use the proceeds thereof, after paying the debts of the society, to purchase a lot of land in any part of Boston and build thereon another meeting-house. *St.* 1858, *c.* 153. The plaintiffs, for the purpose of selling their meeting-house and building another, caused the pews in the house to be duly appraised by three disinterested persons according to law ; and sold their house and land by public auction to the defendant Weld, who signed a memorandum of sale, and refused to accept a deed solely upon the ground that the plaintiffs could not give a good title. The survivors of the grantors and grantees in the indenture of 1828 were made parties to the bill, and answered disclaiming any interest in the premises.

*H. W. Suter*, for the defendant Weld. By the indenture of 1828, the founders of Pine Street Church dedicated and limited the premises conveyed to be used as and for a meeting-house and for no other use or purpose whatsoever, except as is therein provided ; and distinctly prescribed the form of worship to be observed and the articles of belief to be inculcated and disseminated. Although by the terms of this indenture those pew holders who were not members of the church could have no voice in the management of its affairs, yet their rights as pewholders are distinctly recognized and equally guarded with the rights of all others interested. Neither the indenture of 1831 nor any other evidence shows that any one wished or intended

to change or pervert the uses and purposes to which the premises had been dedicated, or to do more than to confer on the pew-holders the same rights and privileges that pewholders enjoyed in religious societies organized under the general laws of the Commonwealth; and to carry out this intention more effectually an act of incorporation of the plaintiffs was obtained. *St.* 1831, *c.* 37. It is not probable that within three years from the foundation of this charity all parties interested had become so indifferent to the trusts which they had so carefully defined, as to unite in a conveyance to discharge the premises of all trusts.

The indenture of 1828 conferred no power of sale on the trustees. Even where the *cestui que trust* is *sui juris*, or where there is a valid limitation over, the trustee has no right to sell or dispose of the trust property unless express power is given him; and although the *cestui que trust* may call upon a trustee to convey the estate, yet he should generally seek the sanction or direction of a court of equity. 2 Story on Eq. §§ 978, 979. Hill on Trustees, (3d Amer. ed.) 381, 382 & notes. *In re Turner*, 10 Barb. 557. *Moody v. Walters*, 16 Ves. 309. Here the male members of the church were not the only parties interested. Upon the sale of the pews by the deacons, the pewholders not members of the church became interested and *cestuis que trust*, and acquired good and valid interests in the premises, which the court would recognize and protect, and of which they could not be deprived without their own consent or upon a satisfactory indemnity. And it would seem that the unanimous consent of the pewholders was not obtained. The plaintiffs' title was therefore defective. *Attorney General v. Federal Street Meeting-house*, 3 Gray, 45. *Gay v. Baker*, 17 Mass. 435. If the premises became vested in the plaintiffs, burdened with the trusts, it would be a perversion and breach of trust for the plaintiffs to sell the property; and a purchaser with notice (as Weld would be) would be liable to be called upon to restore the property. A majority of those interested have not the power to discharge the trusts and appropriate the property to different purposes, and so pervert it, and the founders may insist on the trusts being held sacred. *Milligan v. Mitchell*, 3 Myl. & Cr. 72

*Attorney General* v. *Pearson*, 3 Meriv. 400, 419. *Miller* v. *Gable*, 2 Denio, 525. *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch. 502 *& seq.* *Dartmouth College* v. *Woodward*, 4 Wheat. 630.

The trusts declared in the indenture of 1828 were intended to be of perpetual obligation, and for the benefit not only of those who were then the male members of the church, and who were parties thereto, but also for the benefit of all successive male members "to the latest generations." This created an equitable remainder, and the trust could be discharged by the indenture of 1831 only as to those who were parties to it. The premises would thus come to Weld charged with the original trusts. *Hildreth* v. *Eliot*, 8 Pick. 293. *Salisbury* v. *Bigelow*, 20 Pick. 180.

If the court shall hold that the plaintiffs can make a good title, Weld will be liable to see to the application of the purchase money; for where a trust is of a defined and limited nature the trustee can give no receipt. 2 Story on Eq. § 1127. 1 White & Tudor's Lead. Cas. in Eq. 80, 92, notes to *Elliot* v. *Merryman*.

If the plaintiffs cannot otherwise give a good title to the property discharged of all trusts, the *St.* of 1858, *c.* 153, will not aid them; and, if it proposed to do so, it may be questioned whether it was within the constitutional power of the legislature. *Sohier* v. *Massachusetts General Hospital*, 3 Cush. 497. *Gay* v. *Baker*, 17 Mass. 435.

*C. Demond*, for the plaintiffs. By the indenture of 1828, all the parties intended to have the meeting-house and premises held under certain trusts for the use of Pine Street Church, so that no person not a member of that church and not holding a certain faith could have any voice in its affairs, and thus by force of the instrument itself secure forever the preaching of certain doctrines in that place. By the indenture of 1831, as appears by the indenture itself and the previous vote, all the parties to it desired, intended, and, so far as they could, did convey the premises to the plaintiffs, free from and clear of all the trusts contained in the first indenture. The fact that the church found itself unable to support the preaching of the gospel as contem

plated sufficiently accounts for the change of opinion as to the means by which the end might be secured.

The indenture of 1831, executed by the founders of the trust, by all the trustees, and at the unanimous request of the male members of the church, the *cestuis que trust*, being all the parties interested, discharged the trusts. *Salisbury* v. *Bigelow*, 20 Pick. 185. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 60. Lewin on Trusts, 260, 286. By the terms of the first indenture, pewholders were not only subject to the trusts, but " also to all the rights of property of the said trustees as proprietors of the fee," including their right to sell. All the pewholders gave up their deeds and took new ones from the plaintiffs, except one; and if his rights were not terminated by the deed, they are barred by the statute of limitations. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 61–64.

If there was an equitable remainder to those who should hereafter become members of the church, still, as the church could not sustain the public preaching of the gospel under the trust indenture, but could by discharging these trusts, the change made was beneficial, and such future members, like *cestuis que trust* not *sui juris*, were bound by the acts of the trustees; and if the conveyance was such as equity would have ordered, it is good without such order. Lewin on Trusts, 413, & cases cited. 2 Story on Eq. § 978, and authorities cited. If the male members of Pine Street Church had not the whole equity in the premises, they were the *cestuis que trust*, and, like equitable tenants in tail, could destroy the equitable remainder by destroying the particular estate for life. *Archer's case*, 1 Co. 66. *Moody* v *Walters*, 16 Ves. 283. Lewin on Trusts, 502.

If the trusts were not discharged by the indenture of 1831, the plaintiffs for more than twenty years since its execution have had entire and exclusive possession of the estate, claiming adversely to both trustees and *cestuis que trust*, and asserting that all trusts were fully discharged; and have, with the full knowledge and consent of church and trustees, expended large sums of money on the estate. Such adverse possession and acquiescence constitute a complete bar to all claims by trustees

or *cestuis que trust. Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 61–64. Lewin on Trusts, 612, 617. 2 Story on Eq. §§ 1520–1522. *Beckford* v. *Wade.* 17 Ves. 97.

Weld will not be bound to see to the application of the purchase money, if there are any trusts outstanding; for it is well settled that where the trusts are well defined and the money is not merely to be paid over to third persons, but is to be applied by the trustees to purposes which require deliberation and discretion, the purchaser is not bound to see to its application. 2 Story on Eq. § 1134. *Wormley* v. *Wormley,* 8 Wheat. 422, 443.

The *St.* of 1858, *c.* 153, authorizes a sale, and is constitutional and valid. *Sohier* v. *Massachusetts General Hospital,* 3 Cush. 497.

By the Court. It is immaterial to consider whether the trust created by the indenture of 1828 and the acts of the parties thereto at and before the time of its execution and delivery could be deemed a public charity. The legal estate clearly vested in Proctor and others, the grantees named in that indenture. The indenture of 1831, conveying the premises to the society, was executed by said grantees with the assent of their grantors, at the unanimous request of the members of the church, and was accepted by the society, who immediately entered upon the land, and have ever since, for a period of more than twenty years, had the open and exclusive occupation, improvement and use thereof, claiming title, without any interruption or adverse claim, and have been authorized by the legislature to sell the land free and discharged of all trusts. Under these circumstances there can be no doubt of their power to sell and convey a clear title, discharged of all trusts, and without any responsibility on the part of the purchaser to see to the application of the purchase money. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 62. *Wells* v. *Heath,* 10 Gray, 27.

*Decree for the plaintiffs.*